IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| AMERISTEEL CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| vs. | : | 7:96-CV-85 (HL) |
| | : | |
| EMPLOYERS MUTUAL CASUALTY | : | |
| COMPANY, et al., | : | |
| | : | |
| Defendants. | : | |

_____

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is the motion for summary judgment (Doc. 123) of defendant Employers Mutual Casualty Company ("Employers").  In this case, plaintiff Ameristeel Corporation ("Ameristeel") originally brought suit against seven insurance companies, seeking to recover benefits under liability insurance policies issued between 1980 and 1987 to compensate for costs associated with the remediation of environmental damage in and around the Tifton, Georgia, area.  Ameristeel has settled and/or dismissed its claims against six of the original defendants, and Employers is the only insurer remaining as a defendant in the case.  Upon due consideration of the arguments of counsel, the evidence in the record, and the relevant legal authorities, and for the reasons set forth more fully below, the Court finds that there are no genuine issues of material fact and that Employers is entitled

to judgment as a matter of law.  Accordingly, defendant Employers' motion for summary judgment is hereby **GRANTED**.

A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

I.    **Factual Background**

On review of Employers' motion for summary judgment, the Court views the evidence and all factual inferences therefrom in the light most favorable to Ameristeel, the party opposing the motion.  See Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

The events giving rise to this case began in April 1981, when Ameristeel, then known as Florida Steel, entered into a relationship with SoGreen Corporation in Tifton, Georgia. During the course of this business relationship, Ameristeel paid SoGreen to accept truckloads of waste material known as flue dust, which SoGreen was to use to make fertilizer. As of November 1980 flue dust – officially referred to as "K061" – was classified under the terms of the Federal Resource Conservation and Recovery Act ("RCRA") as a hazardous substance. A loophole in the regulations of the Environmental Protection Agency ("EPA"), however, permitted the recycling of flue dust as a fertilizer component, in which case it was no longer regulated as a hazardous substance.

Initially, the flue dust shipped by Ameristeel was stored in a large warehouse on the SoGreen site in Tifton until it could be mixed with lime and sold as fertilizer. The Environmental Protection Division of Georgia's Department of Natural Resources ("EPD") issued a permit for SoGreen to store the material in the warehouse. SoGreen arranged to accept flue dust from a number of other steel companies besides AmeriSteel. From April of 1981 until the end of that year, Ameristeel shipped 2139 tons of flue dust to the SoGreen warehouse. Over the next five years, it shipped more than 30,000 tons of the dust. SoGreen continued to accept shipments of the dust from Ameristeel and the other steel mills until 1986, when EPD discovered large piles of flue dust on the ground outside the warehouse in violation of the permit and of environmental regulations. Subsequent investigation uncovered large amounts of flue dust illegally stored or buried at five other

3

properties associated with SoGreen and its principal, Herman Parramore. The primary site is referred to in the record as the "SoGreen" or "Warehouse" site. The other sites are referred to as the "Fertilizer" site, the "Ball Farm" or "Magnolia" site, the "Roy Jackson/9th Street" site, the "Peacock Farm/Colquitt" site, and the "Barren/Cemetery" site.

As it became apparent that SoGreen and Mr. Parramore lacked the resources to clean up the contaminated sites, EPD looked to Ameristeel and the other "generators" of the hazardous waste to coordinate and pay for the clean-up operations. Ameristeel and four other steel companies formed a "Generator Group" and negotiated a cost-sharing agreement. In addition to the costs of the clean-up, Ameristeel also paid to settle a class action lawsuit brought by property owners from the area around the SoGreen/Warehouse site, referred to as the "Mathis litigation." Ameristeel contends that its total losses as a result of the illegally-stored flue dust, including expenses for the settlement of the Mathis litigation and the remediation of all six sites, have exceeded $12.9 million.

In this case, Ameristeel has sought to recover benefits from its liability insurance carriers to compensate for those losses. Employers' policy, in effect between January 1, 1980, and January 1, 1982, was an excess liability policy that covered losses above $6 million. In 1981, Ameristeel's primary insurer was Hartford Accident & Indemnity Insurance Company, under a policy with limits of $1 million. Ameristeel also maintained an umbrella policy with First State Insurance Company to cover losses between $1 million and $6 million. After 1981 Hartford provided all three levels of coverage. Ameristeel has

settled or dismissed its claims with all other insurers in this case.  The terms of those settlement agreements have not been disclosed.  Only Employers remains as a defendant in this case.  Although Employers only provided excess coverage during nine months of the five-year period of Ameristeel's liability, Ameristeel seeks to have Employers provide coverage for all losses above $6 million during the entire period.

Employers is entitled to summary judgment as to Ameristeel's claims for benefits for two reasons.  First, there is no evidence to show that there was an "occurrence" sufficient to trigger coverage during the policy period of the Employers policy.  Second, to the extent that some property damage may have occurred between April 1981 and January 1, 1982, the evidence is insufficient to support a finding that the damage for any covered occurrence was sufficient to exhaust the $6 million limits of the underlying policies.

## II.    Trigger of Coverage

Ameristeel has failed to meet its burden as the party opposing a motion for summary judgment.  Employers has met its initial burden of showing by reference to pleadings, depositions, discovery responses, and supporting affidavits that there was no evidence of an "occurrence" in 1981 that would trigger coverage under the excess policy.  Employers having met its initial burden, the burden then shifts to Ameristeel to produce specific evidence, sufficient to create a genuine issue of material fact, showing that coverage was

triggered during the coverage period of the Employers excess policy.  See <u>Castleberry v.</u>
<u>Goldome Credit Corp.</u>, 408 F.3d 773, 786 (11th Cir. 2005).

The Employers policy incorporated the terms of coverage of the First State umbrella policy, which was an "occurrence-based" policy.  The policy provides coverage for property damage "caused by an OCCURRENCE."  The term "occurrence" is defined as "an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED."  Doc. 128, Tab 17.[1] Although Georgia courts have not ruled on the question, federal district courts in all three of Georgia's districts have applied Georgia law to "occurrence" policies with similar terms to hold that "exposure during dates of coverage to conditions that result in property damage constitutes an 'occurrence' within the meaning of these insurance contracts."  <u>Boardman</u> <u>Petroleum, Inc. v. Federated Mut. Ins. Co.</u>, 926 F. Supp. 1566, 1578 (S.D. Ga. 1995). See, also, <u>Briggs & Stratton Corp. v. Royal Globe Ins. Co.</u>, 64 F. Supp. 2d 1346 (M.D. Ga. 1999); <u>Arrow Exterminators, Inc. v. Zurich American Ins. Co.</u>, 136 F. Supp. 2d 1340 (N.D. Ga. 2001).  In this case, coverage would have been triggered under the Employers' policy when flue dust was first dumped or stored on a particular piece of property, exposing the soil to contamination that would result in property damage.

---

[1]Document 128 consists of exhibits to Employers' Motion for Summary Judgment.

Ameristeel has failed to produce sufficient evidence to support its claim that contamination occurred in 1981. In support of its motion for summary judgment, Employers presented several items of evidence to show that there was no contamination during the first nine months that Ameristeel transferred flue dust to SoGreen. Howard Barefoot, who was Unit Coordinator for the Industrial and Hazardous Waste Management Unit of the EPD between 1976 and 1984, has testified by affidavit that the SoGreen/Warehouse site was inspected on May 12, 1981, on February 10, 1982, and on June 24, 1982, and that on each occasion the inspector observed no spilled or improperly stored flue dust. The inspection reports did take note, however, of violations of hazardous waste regulations due to the improper storage of chemicals unrelated to this litigation. Doc. 128, Tab 4.

Former SoGreen/Warehouse site supervisor Carter Choate has testified by affidavit that prior to 1982 there was no accumulation of flue dust outside the warehouse. Doc. 128, Tab 7. According to Mr. Choate, the storage space in the warehouse was sufficient to keep up with the inflow of flue dust during the first year of the operation, before the shipments increased and the market for the fertilizer product diminished substantially. Id. In a December 30, 1991 letter to Employers, Ameristeel's environmental counsel stated that the excessive accumulation and improper diversion of flue dust at SoGreen began "subsequent to the period covered by the policy issued by [Employers]." Doc. 128, Tab. 15-1. Ameristeel's director of environment and quality, James Turner, testified twice by

deposition that he was aware of no evidence to contradict the statement by his company's lawyer in the December 30, 1991 letter.  (Turner Dep. (3/21/02), pp. 171-72; Turner Dep. (5/2/03), pp. 60-61.)

The first mention in the record of any flue dust contamination on any site is in an August 31, 1983 Trip Report reflecting an inspection by Albert Langley of EPD.  In that report, Mr. Langley noted "[f]lue dust was evident on the ground around the entrance of the facility. This results from insufficient care during the loading/unloading process."  Doc. 128, Tab. 5.  In a subsequent letter to Herman Parramore of SoGreen, dated September 14, 1983, John Taylor of EPD stated:

> During the inspection, Mr. Langley also noted that there was a significant amount of flue dust on the ground around the entrance to the waste pile building.  **Although this dust would be classified as "de minimis" losses and would not constitute a violation**, every effort possible should be made to keep these losses at a minimum.

Doc. 128, Tab 6 (emphasis added).  Thus, the first recorded observation of any flue dust contamination occurred some twenty months after the expiration of the Employers policy and indicated only a small and easily remediable amount of spillage, in contrast to the very large piles of dust that were found on the site in 1986.  Such minimal spillage observed in late 1983 hardly leads to an inference that there was contamination on the site in 1981.  To the contrary, the small amount of the dust observed on the ground suggests that the initial contamination occurred only shortly before the September 14, 1983 visit.

In response to this substantial evidence that there was no contamination prior to January 1, 1982, Ameristeel relies on the testimony of former EPD environmental specialist Albert Langley, who began working for EPD in December 1982.  Mr. Langley made several visits to the SoGreen/Warehouse site.  In August 1983, Mr. Langley made the inspection noted above in which he observed "de minimis" amounts of flue dust spilled around the entrance to the warehouse.  On February 17, 1984, an inspector reporting to Mr. Langley noted that some flue dust was dumped on the ground of a pond on the site.  In 1984 and 1985, Mr. Langley investigated a complaint from Mr. L. C. Tyson, who stated that he had witnessed the dumping of fifty truckloads of flue dust on the Ball Farm site, neighboring his farm, in the summer of 1982.  On a visit in April 1986, Mr. Langley observed large piles of flue dust that were "extremely" obvious.  Langley Dep. at 15. These piles had not been present during an August 1985 inspection.  Id.  Mr. Langley inferred that the large build-up of flue dust in 1986 had occurred because "everything they had taken in for the entire year had greatly exceeded their capacity of their building and was piled up all over the place outside."  Id. at 14.

Mr. Langley's testimony regarding contamination in 1981 contributes nothing to Ameristeel's case.  Mr. Langley was not even employed by EPD in 1981, and has no personal knowledge of the conditions on the SoGreen/Warehouse site at that time. Nevertheless, he offers an "opinion" that contamination began soon after SoGreen began to accept flue dust.  At Mr. Langley's deposition, counsel for Plaintiff asked:

9

Q.    Do you have an opinion or a belief with respect to when the SoGreen
      site first became contaminated with K061?

A.    My opinion would be probably the first time Mr. Parramore had
      material moved to the property, there was some spillage and et cetera
      on the site and that would have probably been when K061 was first
      classified as K061 instead of just being flue dust.

Q.    1980 or 1981?

A.    '81, yeah. **But that again is opinion, no proof.**

(Langley Dep. at 53 (emphasis added).)  Later in his deposition Mr. Langley testified that

in his opinion, Mr. Parramore had allowed the dumping of flue dust "from the very

beginning." Id. at 57.  When asked about the basis for his opinion, Mr. Langley testified

that it was "[b]ased on general observation, no scientific and no analysis and no proof other

than just looking at the situation at the facility." (Id. at 78.)  In other words, Mr. Langley's

"opinion" that there was some contamination in 1981 is only his speculation, unsupported

by any personal observation, any inferences rationally based on his perceptions, any

scientific, technical or other specialized knowledge, or any application of reliable principles

and methods to facts or data.  Such speculation cannot be used to create or support a

genuine issue of material fact.  Speculation is not evidence.  See Williamson Oil Co., Inc.

v. Phillip Morris, U.S.A., 346 F.3d 1287, 1316 (11th Cir. 2003) (quoting SEC v. Alejandro

Duclaud Gonzalez de Castilla, 184 F. Supp. 2d 365, 376 (S.D.N.Y. 2002) ("While in a

motion for summary judgment every inference based upon an established fact must be

drawn against . . . movants, as juries are regularly advised, speculation cannot substitute

for proof.").

    In addition to the testimony of Albert Langley, Ameristeel offers the testimony of

Herman Parramore to suggest that there was a degree of contamination on the site in 1981.

This testimony has been deemed inadmissible and excluded by the Court in a January 12,

2005, Order.  Even if it were to be admitted, it is too vague and inconclusive to support the

creation of a genuine issue of material fact.  Ameristeel cites the following exchange from

Mr. Parramore's deposition:

> Q.    Well, let me get back to the question of unloading of flue dust directly
>        onto the ground and then mixing with lime.  Would you agree that
>        that was occurring in 1985, whether or not it was authorized?  That's
>        not what I'm interested in.  Was that occurring?
>
> A.     Yes.  I understand what you're saying.  That was not an uncommon
>        practice for us to do.
>
> Q.    Would you have been doing that in 1984?
>
> A.     **Possibly**, from earlier than that.
>
> Q.    And '83 and '84, and all the way back to the beginning?
>
> A.     Very **possibly**, because when we didn't have an order for, sufficient
>        orders to handle what we were getting into the blends, we would mix
>        it with the lime and that would usually be done outside.
>
> Q.    Is it **fair to assume** that when Atlantic Steel or Florida Steel first
>        shipping, started shipping their dust, the dust that was to be used as
>        fertilizer would have been placed on the ground, for whatever period
>        of time, outside the warehouse from time to time?
>
> A.     I **think** that last statement's right; from time to time it would be.

Parramore Dep., pp. 109-110 (emphasis added).   Mr. Parramore makes no positive statement as to the time when the first contamination took place, and all of his references to the timing of contamination are qualified with references to possibility: "possibly" there was some outside mixing of flue dust prior to 1985; "very possibly" there was some mixing in 1983 or 1984 or "all the way back to the beginning"; he "thinks" it would be fair to assume that some flue dust was placed on the ground "from time to time" when Ameristeel first started shipping its dust.  No reasonable jury could conclude from Mr. Parramore's uncertain statements that it was more likely than not that contamination began in 1981.

In a further attempt to suggest a genuine issue of material fact, Ameristeel offers evidence to indicate that Mr. Parramore allowed drivers to rinse residual flue dust from their trucks onto the ground beside a retention pond on the "Fertilizer" site across the street from the main SoGreen/Warehouse site, which resulted in some degree of contamination to that site.  As is the testimony of Mr. Langley and Mr. Parramore, this evidence is merely speculative as to whether such conduct took place in 1981.   To support its claim, Ameristeel offers the deposition testimony of Wilfred Mundy, who testified: "My understanding is that apparently he had this pond that he would wash out trucks with at times and the material would go – the runoff water or the wash water would go into this pond." (Mundy Dep. at 44-45.)  Mr. Mundy's language indicates that he never witnessed or participated in the washing of trucks and has no personal knowledge of the activity.  His statement appears to be based on hearsay from unidentified declarants.  Even if admissible,

his testimony is not probative of the date on which the first truck was rinsed.  It is merely assumed that this activity must have occurred from the beginning of the operation.

Although it is possible that flue dust was being washed into the pond as early as 1981, the evidence is not sufficient to support a reasonable inference that such activity was taking place at that time.  Instead, Ameristeel would ask the jury to engage in speculation and conjecture.  The earliest substantive evidence of any contamination is Mr. Tyson's report of dumping at the Ball Farm site in 1982 and Mr. Tyson's report of "*de minimis*" spillage at the SoGreen site in August 1983. With the evidence that is before the Court, Ameristeel cannot meet its burden of showing that there was an occurrence in 1981 that triggered coverage under the Employers policy, and Employers is entitled to judgment as a matter of law.

## III.    Exhaustion of Underlying Coverage

Even if some contamination did occur in 1981, the evidence in the record establishes as a matter of law that any damage caused by this contamination was not sufficient to exhaust the primary and umbrella policies provided by Hartford and First State and require coverage by the Employers policy.  Ameristeel all but concedes that there was no significant accumulation of flue dust on the SoGreen or Fertilizer site in 1981, but alleges only a degree of "contamination" that was difficult to observe.  See, e.g.,  Plaintiff's Response Brief, Doc. 136, pp. 7, 10.  Ameristeel does not contend that there was any contamination on the other sites in 1981.  Nevertheless, Ameristeel argues that the very first

spill of any flue dust on any of the contested properties was the beginning of a single "occurrence" that continued throughout the five-year period of operations at the SoGreen site, and that Employers is liable for the entire amount. This argument is unsupported by the law or the evidence, and would lead to an inequitable result. Even under a "continuing occurrence" theory, the dumping at each site must be treated as a separate occurrence.

The language of the policy does not support Ameristeel's argument that all of the illegal dumping at all of the different sites constituted a single "occurrence" for coverage purposes. The First State policy, which is incorporated into the Employers policy, defines an occurrence as "an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED." Doc. 128, Tab 17. The First State umbrella policy provides a coverage limitation of $5,000,000 per occurrence. With respect to the definition of a single occurrence, the policy provides that "all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one OCCURRENCE." Id.

Although it is arguably correct that continued dumping of the same substance in the same place could be considered "continuous or repeated exposure to substantially the same general conditions," the same cannot be said for separate sites. Dumping a second or third load of flue dust on top of or beside the first load might be a continuation of a previous

14

exposure; the property is already damaged and the repeated dumping continues the damage. Dumping a load of flue dust on a different site miles away, by contrast, constitutes an entirely new exposure and entirely new general conditions for that site. Before the first load is dumped on a site, there is no property damage there, and no condition that will lead to property damage. The contamination of different sites must be considered separate occurrences.

When each site is treated as a separate occurrence, there is no occurrence for which the total cost of remediation exceeds $6 million. Ameristeel contends that the total cost for cleaning up the SoGreen site was $4,835,188. Even if the entire cost of the Mathis class action settlement ($1,062,000) were allocated solely to the SoGreen site, the total costs incurred would be less than $6 million. The alleged cost for the Fertilizer site clean-up was $3,147,249. The alleged cost of clean-up for the remaining four sites totaled $3,618,857. There is no occurrence, therefore, for which the underlying coverage of the Hartford and First State policies would be exhausted, even if there were evidence of any occurrence taking place during the coverage period of the Employers policy.

## IV.   Notice of Claim and Allocation of Liability

Summary judgment is required for the reasons discussed above. In addition to these grounds, Employers has advanced two alternative arguments for summary judgment, one based on its contention that it did not receive the necessary notice of loss from Ameristeel, the other based on a theory of the allocation of liability among successive policies of

15

insurance.  Neither of these arguments sets forth an adequate basis for summary judgment.
With regard to the matter of notice, there remain genuine issues of material fact.
Employers argues that Ameristeel failed to provide adequate notice of loss for the
"Fertilizer" site and failed to seek Employers' approval of the Mathis settlement.  The
record shows that Ameristeel sent a number of detailed letters regarding the various sites
and the Mathis litigation between 1991 and 1993.  Although none of the letters makes
reference to the Fertilizer site as a separate site, that tract of land was located directly across
the street from the main SoGreen/Warehouse site.  The letters refer to the primary site by
the street name, as the "SoGreen Highland Avenue site."  This is sufficient to create at least
a genuine issue of material fact as to whether Employers had notice of losses on both sides
of the street.  As to the Mathis litigation, under the policy Ameristeel was not to make or
agree to any settlement in excess of the underlying coverage without the approval of
Employers.  The Mathis settlement, for $1,062,000, was not in excess of the underlying
$6,000,000 in coverage.  Employers did have full notice of the existence of the Mathis
claims, denied a request to provide a defense, and refused the opportunity to participate in
the litigation.

This Order makes no ruling with regard to Employers' allocation argument.  In its
motion for summary judgment, Employers argues that fairness requires the allocation of
liability among the various consecutive insurance carriers.  In other words, it should not be
liable for the entire amount of the loss over six years, but only for a *pro rata* share

16

according to its time on the risk.  Although this argument has intuitive appeal, there is no

authority for (or against) such allocation under Georgia law.  A review of authorities in

other jurisdictions reveals courts around the country to be almost evenly split as to the

matter.  It appears that a slight majority follow the approach of the Supreme Court of

Minnesota in <u>Northern States Power Co. v. Fidelity and Casualty Co. of New York</u>, 523

N.W.2d 657 (Minn. 1994).  That court held that where several consecutive policies provide

coverage under an injury-in-fact trigger, "each insurer is held liable for only those damages

which occurred during its policy period; no insurer is held liable for damages outside its

policy period."  <u>Id</u>. at 662.  Other decisions that have followed this approach include

<u>Spartan Petroleum Co. Inc. v. Federated Mutual Ins. Co.</u>, 162 F.3d 805 (4th Cir. 1998)

(South Carolina law) and <u>Olin Corp. v. Insurance Co. of North America</u>, 221 F.3d 307 (2nd

Cir. 2000) (New York law).  A significant number of courts, however, have taken the

opposite course and held that each of the consecutive insurers is jointly and severally liable

for all losses and that the insured may collect the total liability from any one triggered

policy, up to the limits of coverage.  The leading case for this approach is <u>Keene Corp. v.

Ins. Co. of North America</u>, 667 F.2d 1034 (D.C. Cir. 1981).  Other cases following the

"joint and several" approach include <u>J. H. France Refractories Co. v. Allstate Insurance

Co.</u>, 626 A.2d 502 (Pa. 1993) (Pennsylvania law), <u>American National Fire and Insurance

Co. v. B & L Trucking and Construction Co.</u>, 951 P.2d 250 (Wash. 1998) (*en banc*)

(Washington law), and <u>CSX Transportation, Inc. v. Admiral Insurance Co.</u>, 1996 WL

17

33569285 (M.D. Fla. Nov. 6, 1996)  (Florida law).  The legal and policy concerns that underlie the two approaches are complex and have not been thoroughly explored by the parties.  Because there are independent grounds for summary judgment, there is no need to determine the issue of allocation.  This Court will not rush in where the Georgia courts have yet to tread.

## V.     Conclusion

For the reasons set forth above, the Court finds that there are no genuine issues of material fact to be determined at trial and hereby grants Defendant Employers' Motion for Summary Judgment.  There being no other claims remaining in the case, the Clerk of Court is directed to enter final judgment.

SO ORDERED, this the 26th day of July, 2005.

**s/ Hugh Lawson**
HUGH LAWSON, JUDGE

chw

18